1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **SOUTHERN DISTRICT OF CALIFORNIA**
10
11  FRV, a Minor, By and Through His          Case No. 21-cv-329 DMS (BLM)
    Guardian ad Litem, CRISTAL
12  CAZARES VALENZUELA; and                   **FINDINGS OF FACT AND**
    SONIA VALENZUELA PEREZ,                   **CONCLUSIONS OF LAW**
13  Individually,
14                Plaintiffs,
15       v.
16  UNITED STATES OF AMERICA;
    and DOES 1 through 20, Inclusive,
17
                  Defendant.
18

19       Plaintiffs FRV, a minor, by and through his guardian ad litem, Cristal Cazares

20  Valenzuela ("Ms. Cazares"), and Sonia Valenzuela Perez ("Ms. Valenzuela"), filed

21  their Complaint in this case on February 23, 2021, against Defendant United States

22  of America alleging one count of medical negligence under the Federal Tort Claims

23  Act ("FTCA") relating to a birth injury of FRV.  (ECF No. 1.)  Plaintiffs allege an

24  employee of the United States, Melissa Hawkins, M.D. ("Dr. Hawkins"), an

25  obstetrician-gynecologist ("OBGYN"), committed medical malpractice by

26  mismanaging Ms. Valenzuela's labor and delivery of her son, FRV, thereby causing

27  Plaintiffs injury and damages, including medical expenses, loss of earnings, and

28  emotional distress.

The case was presented to the Court through a bench trial beginning on June 26, 2023, and concluding on July 11, 2023.  Kenneth Sigelman, Jonathan Ehtessabian, and Max Gruenberg appeared for Plaintiffs.  Assistant United States Attorneys Janet Cabral, Stephanie Sotomayor, and Juliet Keene appeared for Defendant.  Eighteen expert witnesses and eight percipient witnesses testified at trial.  The case was well tried by counsel, which provided the Court with a full understanding of FRV, his family, and the parties' competing positions on the standard of care, causation, injury and damages.  Having carefully considered the evidence and arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, and finds that Dr. Hawkins acted within the standard of care.  Accordingly, the Court finds in favor of Defendant for the reasons set forth below.

# I.

## SUMMARY

This case arises out of the alleged mismanagement of the labor of Ms. Valenzuela and delivery of FRV.  The discovery deadlines and trial date were continued to allow meaningful neurocognitive testing of FRV once he turned four years old.  FRV was four years and nine months old at the time of trial.

Plaintiffs' experts opine that FRV is cognitively impaired to a degree that he will never work or live independently, and he will require attendant care for the rest of his life.  Plaintiffs contend FRV suffered hypoxic ischemic encephalopathy of both an acute-profound and partial-prolonged pattern,[1] and brachial plexus injury[2] caused by shoulder dystocia[3] as a result of Dr. Hawkins' mismanagement of

---

[1] Hypoxic ischemic encephalopathy ("HIE") is a brain injury caused by oxygen deprivation to the brain.  HIE is characterized by evidence of acute-profound or partial-prolonged asphyxia.  Partial-prolonged asphyxia is a result of inadequate oxygen to the brain for longer than 30 minutes.  Acute-profound asphyxia is total, or near total, lack of oxygen to the brain that occurs over a period of minutes.

[2] Ripping of the nerves that sends signals from the spinal cord to the shoulder, arm, and hand.

[3] Shoulder dystocia is a condition that happens when the baby's head is delivered but one, or both, of the shoulders is stuck (usually behind the mother's pubic bone) during vaginal delivery.  There are no signs and no way to prevent the condition, and it is a life-threatening emergency that can cause serious injuries to the baby and mother.

1   Plaintiffs' labor and delivery.  Plaintiffs contend that because of Dr. Hawkins' failure
2   to properly interpret fetal heart tracings ("FHTs"), failure to detect signs of fetal
3   intolerance to labor, and failure to timely intervene and deliver FRV by Caesarean
4   section ("C-section") in the face of persistent "nonreassuring" FHTs, FRV suffered
5   life-altering injuries.  Specifically, Plaintiffs contend that Dr. Hawkins fell below the
6   standard of care by failing to recommend urgent cesarean delivery of FRV by 11:30
7   a.m. based on FRV's nonreassuring heart tracings and other clinical factors,
8   including Ms. Valenzuela's advanced maternal age (39 years), gestational diabetes,[4]
9   estimated fetal weight by sizing ultrasound, at 8 lbs., 14 oz., and pre-eclampsia.[5]
10  Plaintiffs' theory is that FRV's hypoxic ischemic encephalopathy and brachial
11  plexus injuries would not have occurred had he been delivered by C-section by 12:00
12  p.m., rather than naturally (vaginally) at 9:32 p.m.

13         Defendant's experts opine that FRV will be able to graduate high school, post-
14  secondary school, and maintain gainful employment.  Defendant acknowledges that
15  FRV will have life-long limitations to his right arm and shoulder because of the
16  brachial plexus injury, which likely occurred during the shoulder dystocia.
17  Defendant contends that Dr. Hawkins with the assistance of her nursing team
18  managed Ms. Valenzuela's labor and delivery with the requisite skill of a reasonably
19  careful OBGYN, that she made appropriate evidence-based medical decisions
20  throughout labor based on the information known to her at the time, including her
21  interpretations of the fetal heart tracings, and that she properly expedited delivery
22  when confronted with the medical emergency of shoulder dystocia, ultimately
23  saving FRV's life.  Defendant points out that reading fetal heart tracings is subjective
24  (interpretive), and not amenable to objective calculation and precision.  Defendant
25  further argues FRV's estimated fetal weight of 8 lbs., 14 oz. was within normal

---

[4] Gestational diabetes means the mother has elevated blood sugar levels during pregnancy, which typically resolves after birth.  The condition can impact placental function, fetal weight gain, and the mother's ability to handle labor.
[5] Pre-eclampsia is a condition in pregnancy which is characterized by high blood pressure.

– 3 –

limits, that Ms. Valenzuela had previously naturally delivered three prior babies, including a baby weighing 9 lbs., 2 oz., all without incident.  Defendant also notes Ms. Valenzuela had gestational diabetes with a prior pregnancy, yet delivered a smaller than average baby, weighing 6 lbs., 10 oz.  Based on the foregoing, Defendant disputes that Dr. Hawkins was negligent, in addition to disputing causation, injury and damages.

The Court had the occasion to meet FRV at trial and to hear from FRV's parents and family members.  The family is close-knit, loving and inspirational in its care of FRV—dealing with FRV's present physical and emotional challenges with fortitude and grace.  The delivery of FRV was complex and traumatic given the unforeseen shoulder dystocia, and FRV suffered serious and unfortunate injuries at birth.

Many of the events regarding the labor of Ms. Valenzuela and delivery of FRV are undisputed and documented in the medical charts and history.  The key disputes are between the parties' expert witnesses and whether Dr. Hawkins breached the standard of care, caused Plaintiffs' injuries, and if so, the extent of those injuries and damages.  Because the Court finds Dr. Hawkins did not breach the standard of care, the discussion below focuses on the opinions of the parties' OBGYN experts, Albert J. Phillips, M.D. ("Dr. Phillips") for Plaintiffs and Jessica Kingston, M.D. ("Dr. Kingston") for Defendant, as well as Dr. Hawkins, the nurses, and percipient witnesses, including Ms. Valenzuela, her husband and other family members.  The principal dispute between the OBGYN experts centers on their interpretation of the fetal heart tracings and whether those tracings indicated an urgent cesarean delivery by 11:30 a.m.

Based on Dr. Kingston's interpretation of FRV's heart tracings—which is largely consistent with the charting of the nurses and opinions of Dr. Hawkins—and her assessment of the totality of circumstances known to Dr. Hawkins at the time, the Court concludes Dr. Hawkins did not breach her duty of care to Plaintiffs by

delivering FRV naturally.  The balance of evidence regarding causation, injury and damages will not be addressed in light of the Court's finding that Plaintiffs have failed to prove by a preponderance of evidence the first element of their negligence claim: breach of the standard of care.

## II.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ms. Valenzuela became pregnant with FRV in early 2018, and received her prenatal care from Vista Community Clinic ("VCC") beginning on March 30, 2018.[6] On October 16, 2021, an ultrasound was performed at Tri-City Medical Center ("TCMC"), which indicated an estimated fetal weight of FRV of 8 lbs., 4 oz. (4,017 grams).  Dr. Christos Karanikkis ordered that ultrasound and noted that if Ms. Valenzuela did not deliver by October 23, 2018, labor would be induced.

On October 21, 2018, in the morning hours, Ms. Valenzuela's water broke while she was at home.  She immediately headed for TCMC, and was admitted to the labor and delivery unit at approximately 8:03 a.m.  In addition to Dr. Hawkins, Kate Wildern, R.N. ("Nurse Wildern") was assigned to Ms. Valenzuela and served as her primary labor and delivery nurse.  When Nurse Wildern's shift ended at 7:00 p.m., Monica Montes, R.N. ("Nurse Montes") took charge as the primary labor and delivery nurse.

Upon admittance, Dr. Hawkins performed a physical exam and obtained Ms. Valenzuela's history.  Dr. Hawkins learned Ms. Valenzuela had mild pre-eclampsia, gestational diabetes, and advanced maternal age.  As part of the physical exam, Dr. Hawkins performed a manual external palpitation to evaluate FRV's size, which she estimated to be 8 lbs., 5 oz. to 9 lbs.—consistent with the ultrasound a few days earlier.  Dr. Hawkins also learned about Ms. Valenzuela's three prior pregnancies resulting in natural births, including one LGA baby weighing 9 lbs., 2 oz.

---

[6] Many of the facts set out in this section are undisputed.  (*See* ECF No. 52 at 3-14, Pretrial Order (Stipulated Facts).)

– 5 –

Dr. Hawkins ordered labetalol to treat Ms. Valenzuela's blood pressure, measured at 162/94 and 160/93. Dr. Hawkins initially induced labor with Cytotec,[7] and then administered Pitocin[8] approximately four hours later. Per Ms. Valenzuela's medical chart, Cytotec was ordered at 10:22 a.m. and 10:40 a.m., and Pitocin was started at 1:55 p.m. FRV's heart tracings were recorded beginning at 8:17 a.m., within minutes of Ms. Valenzuela's admission.

As labor progressed, the nurses and Dr. Hawkins continued to monitor FRV's heart tracings remotely at the nurses' station and at bedside. Every thirty minutes, the nurses charted their impressions of FRV's heart tracings and Ms. Valenzuela's overall health. The heart tracings were reviewed throughout the labor by the nurses and Dr. Hawkins to monitor any accelerations, decelerations, and variability of FRV's heart rate to determine if FRV was well oxygenated and tolerating labor.

Ms. Valenzuela's labor progressed, and at 8:29 p.m., she was 9.5 cm dilated.[9] She had an intense urge to push at that time, and "pushed to the point of exhaustion[,]" (Jt. Ex. 018-001), but failed to deliver FRV. At approximately 8:40 p.m., per Dr. Hawkins' operative report, FRV's heart tracings showed decreased variability and overcompensation after each contraction, indicating intolerance to labor, so Dr. Hawkins obtained Ms. Valenzuela's consent for vacuum-assisted delivery. Dr. Hawkins noted in the chart a fetal heart rate of 80 beats per minute, well below the norm of 110 to 160 beats per minute, and consistent with terminal bradycardia.[10] The vacuum was applied at approximately 9:24 p.m., and this brought FRV's head to crowning, meaning the top of FRV's head was visible at the opening of the vagina. After applying the vacuum a second time, FRV's head was delivered

---

[7] Cytotec is a cervical ripening agent that softens the cervix to facilitate cervical dilatation to allow the baby to pass through the birth canal.

[8] Pitocin is a synthetic version of oxytocin, a hormone that causes the uterus to contract more frequently, strongly, and regularly.

[9] A cervix is fully dilated at around 10 cm.

[10] Terminal bradycardia can occur when a baby is about to be born and its heart rate drops into the bradycardic range, which is below 110 beats per minute for at least 10 minutes.

but Dr. Hawkins noticed FRV's head turtling or retracting backwards, which indicated shoulder dystocia.  Ms. Valenzuela was put in a severe McRoberts position to attempt to relieve the shoulder dystocia.  Three nurses and Ms. Valenzuela's husband, Porfirio Rauda, applied suprapubic pressure to dislodge FRV.  The shoulder dystocia lasted somewhere between five and eight minutes.  It was unanticipated and traumatic.

FRV was born at 9:35 p.m.  He weighed 10 lbs., 11 oz., placing him above the 99th percentile, and he was noted to be floppy, limp without spontaneous respirations, and blue in appearance.  Resuscitation efforts were initiated and he was transported to the TCMC Neonatal Intensive Care Unit ("NICU").  At the NICU, FRV began to have seizure activity and was transferred to Rady Children's Hospital.  During the newborn period, FRV was diagnosed with respiratory failure, hypoglycemia, seizures, brachial plexus injury, hypoxic ischemic encephalopathy, and intracerebral hemorrhage.  FRV also suffered injury to the right C7 and C8 nerve roots, with avulsion of the C8 nerve root, which has required two surgeries.

**A. Jurisdiction**

As a sovereign, the United States is immune from suit unless it consents to be sued by statute.  *United States v. Palm*, 494 U.S. 596, 608 (1990).  The FTCA, 28 U.S.C. § 2671 et seq., is such a statute.  *See Steward v. U.S.*, 282 Fed.App'x. 595, 596 (9th Cir. 2008) (stating "[t]he FTCA waives the government's immunity for tort claims arising out of the negligent conduct of government employees acting within the scope of their employment.").  The government may be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Terbush v. United States*, 516 F.3d 1125, 1128-29 (9th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)).  Thus, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b).

/ / /

1    The United States' sovereign immunity extends to federally deemed entities

2    and individuals sued in their official capacities. *Gilbert v. DaGrossa*, 756 F.2d 1455,

3    1458 (9th Cir. 1985). It is undisputed that Dr. Hawkins and VCC, which employed

4    Dr. Hawkins during the time in question, are federal employees for purposes of the

5    Public Health Service Act ("PHS"), 42 U.S.C. § 233. Section 233 of the PHS

6    provides liability protection under the FTCA for personal injury claims arising out

7    of alleged medical malpractice by federal employees acting within the scope of their

8    official duties. 28 U.S.C. §§ 2679(a)-(b)(1). It is undisputed Dr. Hawkins was acting

9    within the scope of her official duties. Under the FTCA, courts apply "'the law of

10   the place where the act or omission occurred.'" *US Air Inc. v. U.S. Dept. of Navy*,

11   14 F.3d 1410, 1412 (9th Cir. 1994) (quoting 28 U.S.C. § 1346(b)). California law

12   therefore governs this dispute.

13   **B. Negligence**

14   Under California law, the elements of a medical negligence claim include:

15   "(1) a duty to use such skill, prudence, and diligence as other members of the

16   profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate

17   causal connection between the negligent conduct and the injury; and (4) resulting

18   loss or damage." *Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (2006).

19   *See also* Judicial Council of California Civil Jury Instructions ("CACI") 400

20   (Negligence Jury Inst.). "Plaintiffs have the burden of proving each of these

21   elements by a preponderance of the evidence." *Mgmt. Activities, Inc. v. United*

22   *States*, 21 F. Supp. 2d 1157, 1174 (C.D. Cal. 1998) (citing BAJI 2.60). These

23   elements must be established by expert medical testimony, *Cobbs v. Grant*, 8 Cal.3d

24   229, 236 (1972), "unless the conduct required by the particular circumstances is

25   within the common knowledge of the layman." *Landeros v. Flood*, 17 Cal.3d 399,

26   410 (1976). The parties agree each element of Plaintiffs' claim must be established

27   by expert testimony.

28   / / /

### 1. Duty

In a medical malpractice case, the standard of care requires that "physicians exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [their] medical profession under similar circumstances." *Munro v. Regents of Univ. of Cal.*, 215 Cal. App. 3d 977, 984 (1989); *Landeros*, 17 Cal.3d at 410; CACI 600 (Standard of Care Jury Inst.). Dr. Hawkins had a duty to exercise in her management of Ms. Valenzuela's labor that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by other obstetricians under the same or similar circumstances.

### 2. Breach of Duty

"An [obstetrician] is negligent if [she] fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful [obstetricians] would use in the same or similar circumstances." CACI 501 (Standard of Care for Health Care Professionals Jury Inst.). This means that "[m]ere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient, for a doctor is not a warrantor of cures, or required to guarantee results." *Huffman v. Lindquist*, 37 Cal.2d 465, 473 (1951). In addition, "the fact that another [obstetrician] might have elected to treat the case differently or use methods other than those employed by defendant does not of itself establish negligence." *Lawless v. Calaway*, 24 Cal.2d 81, 87 (1944).

### a. Standard of Care Experts

Each party retained an obstetrical expert to opine on the standard of care. Plaintiffs retained Dr. Phillips, and Defendant retained Dr. Kingston. As noted, the experts reached different conclusions regarding whether Dr. Hawkins' conduct fell below the standard of care, and did so principally based on their opposing interpretations of FRV's heart tracings and whether those tracings called for

– 9 –

cesarean delivery by 11:30 a.m.  Dr. Phillips opined that the standard of care required Dr. Hawkins to order an urgent C-section by 11:30 a.m. because of recurrent late and variable decelerations, and prolonged decelerations of FRV's heart rate beginning at around 9:00 a.m. and continuing to 11:30 a.m., as well as intervals of minimal-to-absent heart rate variability during the same timeframe.  Specifically, Dr. Phillips testified that if Dr. Hawkins had ordered an urgent cesarean section by 11:30 a.m., FRV would have been delivered by 12:00 p.m., and would have suffered neither irreversible hypoxic brain injury nor brachial plexus injury.  Dr. Phillips opined Ms. Valenzuela was a high-risk patient—due to advanced maternal age, gestational diabetes, the sizing ultrasound, and high blood pressure—with "persistent nonreassuring" fetal heart tracings, and that subjecting FRV to further ongoing stress of labor when Ms. Valenzuela was remote from delivery posed an unreasonable risk of harm to FRV.[11]

In contrast, Dr. Kingston opined that the standard of care did not require Dr. Hawkins to order an urgent C-section by 11:30 a.m., or at any other time.  She did not interpret FRV's heart tracings to include nearly as many nonreassuring classifications as Dr. Phillips found, and significantly, she did not find within those classifications recurrent late or variable decelerations.[12]

/ / /

/ / /

---

[11] Dr. Phillips is a board-certified obstetrician gynecologist, currently serving as a full-time Assistant Clinical Professor of Obstetrical and Gynecological Residents at Keck School of Medicine at the University of Southern California ("USC").  Dr. Phillips has been practicing obstetrics and gynecology for thirty-eight years.  In his thirty-seven years practicing at Saint John's Health Center in Santa Monica ("St John's"), Dr. Phillips served in roles including Vice Chairman and ultimately Chairman of the Department, Medical Director for Women's Services at St. John's, and also founded and ran the Laborist Program at the hospital.  Additionally, Dr. Phillips serves as a consultant for the Medical Board of California and as an expert witness in legal disputes.

[12] Dr. Kingston is a board-certified obstetrician gynecologist, currently practicing at University of California San Diego ("UCSD") Health.  Dr. Kingston has been a practicing obstetrician gynecologist for twenty-one years.  She is currently the Director for the Division of General Obstetrics and Gynecology at UCSD and is also a Clinical Professor. In these roles, the bulk of Dr. Kingston's time is spent practicing medicine and seeing patients directly.  Dr. Kingston also teaches medical students and resident physicians in her practice.  Apart from these duties, Dr. Kingston is also an oral board examiner for the medical obstetrics board, has participated in writing questions for the National Board of Examiners, is an expert reviewer for the Medical Board of California, and serves as an expert witness in legal disputes.

– 10 –

### b.  Fetal Heart Tracings

Dr. Phillips and Dr. Kingston agree that nurses and obstetricians' interpretations of fetal heart tracings, along with other clinical circumstances, guide an obstetrician in determining the appropriate course of action for labor and delivery. Therefore, both experts carefully studied FRV's heart tracings and were thoroughly questioned at trial about their interpretations, including whether the tracings showed decelerations (late, variable, prolonged, and whether they were recurrent) with minimal-to-absent heart rate variability at specific times—particularly between 8:18 a.m. and 11:30 a.m.

The existence, duration and frequency of accelerations and decelerations of fetal heart rate as well as variability of heart rate are critical to categorizing FHTs. The American College of Obstetricians and Gynecologists ("ACOG") promulgated clinical management guidelines for OBGYNs in July 2009, Bulletin No. 106 ("ACOG 106"), in which it provided "nomenclature, interpretation, and general management principles" to assist OBGYNs with intrapartum fetal heart rate monitoring.[13]   AGOG uses a "three-tiered categorization fetal heart rate interpretation system"—comprised of "Categories I, II and III"—to assist in "determin[ing] if a fetus is well oxygenated." At TCMC, like other medical centers, the fetus's heart rate and mother's contractions are displayed on an electronic monitor in a continuous manner; they are charted by the nurses and categorized pursuant to the AGOG guidelines.  The experts in this case interpreted printouts of FRV's heart tracings and Ms. Valenzuela's contractions in eight-minute segments to render their opinions.  (*See generally* Ex. 100; Def. Ex. 319.)

The experts discussed four types of decelerations referenced in the ACOG guidelines: early, late, variable and prolonged.  The experts also discussed the existence of recurrent decelerations.  An early deceleration is not of concern, while

---

[13] ACOG Practice Bulletin 106 was marked for identification at trial and heavily referenced by the parties.  The Court takes judicial notice of ACOG 106 under Rule 201 of the Federal Rules of Evidence.

late, variable, prolonged, and recurrent decelerations require evaluation and continued surveillance and reevaluation.  An early deceleration is gradual and the onset, nadir (lowest point of the fetal heart rate), and recovery coincide with the beginning, peak, and end of a contraction in most cases.  Early decelerations are typically caused by compression of the baby's head with the mother's contraction. A late deceleration is similar in appearance to an early deceleration, but the onset of the deceleration begins after the start of a contraction.  Its nadir is always past the peak of the contraction, and the recovery back to baseline[14] typically returns after the contraction is over.  A late deceleration is caused by uteroplacental insufficiency, wherein the baby is not able to maintain or get oxygenation.  The presence of a late deceleration can indicate ongoing hypoxia (lack of oxygen) during that period of time.  A prolonged deceleration occurs when the heart rate decelerates fifteen beats per minute from the baseline, and stays below the baseline for at least two minutes. It can be caused by compression against the baby's umbilical cord or by the baby decompensating for something occurring during the stress of labor.  A variable deceleration is a sudden decrease of heart rate off the baseline that drops at least fifteen beats below the baseline with a sharp, jagged edge going down to a nadir that then recovers promptly back to the baseline.  It can be caused by compression on the umbilical cord, and can result in hypoxia and acidosis.  Recurrent decelerations are either late or variable decelerations that occur with at least half of the mother's contractions in a thirty-minute timeframe.

An acceleration of fetal heart rate means the heart rate reaches a peak of at least fifteen beats per minute for at least fifteen seconds.  Accelerations are reassuring because they indicate the baby is not acidotic, i.e., the baby is getting oxygen and not developing high amounts of acid in its blood.  Variability of fetal heart rate shows fluctuation of the fetal heart rate from the baseline.  A normal

[14] Baseline refers to the mean fetal heart rate rounded to increments of five beats per minute during a 10-minute segment. A normal baseline for a fetal heart rate is between 110 and 160 beats per minute.

– 12 –

baseline for fetal heart rate is between 110 and 160 beats per minute.  Moderate variability is fluctuation from the baseline that is between five and twenty-five beats per minute, and is desirable.  Minimal variability indicates a change from the baseline that is less than five beats per minute, and is nonreassuring, though it can be caused from a baby's innocuous sleep cycle, which can last from twenty to sixty minutes.  Absent variability means there is very little change from the baseline, and is nonreassuring.

Category I means a baby has no evidence of decelerations, other than potentially early decelerations, moderate variability, and may have some accelerations.  Category I essentially indicates the baby is tolerating labor well, is well oxygenated, and has no acidosis.  Category III is assigned where the fetal heart tracings show absent variability with recurrent late or variable decelerations, or bradycardia.  Category III is "highly indicative of a baby that is having evidence of acidosis, and it requires prompt intervention to extricate the baby from that situation." (Trial Tr. 533:17-19.)

Category II "is a very broad category that includes everything in between Category I and Category III." (*Id.* 533:20-21.)  Category II includes, among other things, late, variable, prolonged and recurrent declarations, minimal baseline variability, and absent baseline variability with no recurrent decelerations.  Category II is "indeterminate," meaning "you can't be absolutely sure the baby is not having hypoxia with acidosis." (*Id.* 534:7-10.)  According to ACOG 106:

> Category II FHR tracings are not predictive of abnormal fetal acid-base status, yet presently there is not adequate evidence to classify these as Category I or Category III.  Category II tracings require evaluation and continued surveillance and reevaluation, taking into account the entire associated clinical circumstances.  In some circumstances, either ancillary tests to ensure fetal well-being or intrauterine resuscitative measures may be used with Category II tracings.

ACOG 106 is the authority Dr. Kingston used to define baseline, variability, decelerations, and the three-tiered categorization criteria.  Dr. Kingston uses ACOG

1    as the guide for her definitions because ACOG's definitions were created in "an
2    effort to standardize our terminology so that it would improve our use of external
3    fetal monitoring in practice to really get everyone on the same page about defining
4    things . . . and so that is what then led to the categorization[.]"  (Trial Tr. 728:12-
5    729:8.)  Dr. Kingston testified she uses the ACOG definitions to teach her residents
6    and students.

7         While Dr. Phillips also uses the ACOG definitions and guidelines to teach his
8    students and residents, he does not consider ACOG publications to be "gospel" and
9    "can't say in general ACOG guidelines are always correct or [represent] what is
10   practiced in the community."  (*Id.* 556:16-18; 675:9-15.)  Notably, Dr. Phillips did
11   not point to any other authoritative source for interpretating fetal heart tracings, and
12   did not rely on any literature or authority to support his opinions when they differed
13   from AGOG.  Dr. Phillips' challenge to the efficacy of ACOG publications and
14   definitions, while failing to present an alternative source beyond his own opinions,
15   affects the weight to be given to his opinions.

16        Here, from admission to delivery, Nurses Wildern and Montes charted FRV's
17   heart tracings.  Each time the nurses charted FRV's heart tracings, they documented
18   the events of the prior 30 minutes.  At 9:00 a.m., Nurse Wildern documented a fetal
19   baseline of 155, with moderate variability, absent accelerations, no decelerations,
20   and Category I.  (Jt. Ex. 25-007.)  At 9:30, she documented a fetal baseline of 155,
21   with moderate variability, absent accelerations, "late, variable" decelerations, and
22   Category II.  (*Id.*)  At 10:00 a.m., she documented a fetal baseline of 155, with
23   minimal variability, absent accelerations, late deceleration, and Category II.  (*Id.*)
24   As a result of the late deceleration, Nurse Wildern initiated the following care to Ms.
25   Valenzuela: "Administer O2, Notify primary health provider, Palpate uterus at rest
26   to ensure relaxation, Provide explanation to reduce anxiety, Turn to left side."  (*Id.*)

27        At 10:30 a.m., Nurse Wildern did not chart any observations.  (*See generally*
28   Jt. Ex. 25-007.)  She was unable to recall why there were no recordings at that time,

– 14 –

and stated it could have been because Ms. Valenzuela was having an ultrasound or was out of bed.  At 11:00 a.m., Nurse Wildern documented a fetal baseline of 145, with moderate variability, absent accelerations, no decelerations, and Category I, (*id.*), indicating a positive response by Ms. Valenzuela and FRV to her intervention at 10:00 a.m.  At 11:30 a.m., she documented a fetal baseline of 150, with minimal variability, absent accelerations, variable decelerations, and Category II.  (*Id.*)  And at 12:00 p.m., she documented a fetal baseline of 155, with moderate variability, absent accelerations, no decelerations, and Category I.  (*Id.*)  While Nurse Wildern did not have an independent recollection of Ms. Valenzuela's labor, based on her review of the records, she testified there was nothing about this labor that stands out in her mind.  Nurse Wildern has been a labor and delivery nurse for more than 20 years.  The Court credits her testimony.

Drs. Kingston and Hawkins, and the nurses—consistent with ACOG guidelines—agree it is common for patients to transition between Categories I and II during labor depending on the clinical situation and management strategies used. As noted, however, where the parties' experts diverge is on the categorization indicated by the tracings (i.e., Category I or II), and the characterization of the tracings within the assigned category, e.g., whether or not the tracings represent late, variable or prolonged decelerations, and whether they are recurrent.

Dr. Phillips opined that by 11:30 a.m., there was "no evidence of reassuring fetal monitoring," (Trial Tr. 580:16-24), and there was a "persistent Category II strip remote from delivery."  (*Id.* 583:2-7.)  He believed that "90 to 95 percent of the tracings [from 8:18 to 11:30 a.m.] demonstrated either minimal variability or minimal to absent variability," (*id.* 586:6-12), and indicated that FRV was not getting enough oxygen.  Moreover, Dr. Phillips opined that there were recurrent late decelerations followed by minimal variability.  On direct and cross-examination, however, Dr. Phillips conceded it is "difficult to actually identify" many of the contractions on the fetal heart tracings.  (*Id.* 641:21-642:2.)  That is problematic

because the interpretation of a tracing segment and whether it reflects a deceleration depends on the contraction chart. Nevertheless, Dr. Phillips opined that it should have been clear to Dr. Hawkins there was no evidence of reassuring fetal heart tracings.

Dr. Kingston disagreed and noted FRV's tracings from Ms. Valenzuela's admission until 11:30 a.m. showed "transient periods" of Category I mixed with Category II. (*Id.* 768:4-9.) Dr. Kingston opined that about 50 to 60% of the tracings between admission and 11:30 a.m. were Category II, and about 40% of the tracings were Category I, or in between Categories I and II. Essentially, she disputed that the tracings between 8:18 a.m. and 11:30 a.m. were persistently in Category II and that they showed significant minimal-to-absent variability and recurrent decelerations. Instead, Dr. Kingston noted minimal-to-moderate variability tracings, several minimal variability tracings, and no tracings showing absent variability during that time. She also noted one prolonged deceleration, up to three late decelerations, and one variable deceleration, but no recurrent late or variable decelerations during that time.[15]

The different conclusions reached by Dr. Phillips and Dr. Kingston is unsurprising. Dr. Kingston testified that the research shows that when a focus group of obstetricians is given a fetal heart tracing, and blinded to the outcome, only 20 to 40% agree on the interpretation of the tracing. She explained, "it is well-known that there are significant limitations in applying external fetal monitoring to and making conclusions about the outcome and about a baby's status." (Trial Tr. 724:21-24.) She explained that "about 99 percent of the time when we are concerned that a tracing is abnormal, the baby is actually fine." (*Id.* 725:3-6.) ACOG 106 also states that, "[d]espite the frequency of its [i.e., fetal heart tracings] use, limitations of [FHT] include poor interobserver and intraobserver reliability, uncertain efficacy,

---

[15] A finding of recurrent decelerations requires comparing the FHTs to the contraction pattern. However, as both experts noted, Ms. Valenzuela's contraction chart was "not clearly recording" at times. (Trial Tr. 572:2-3.)

1   and a high false-positive rate."

2        Dr. Kingston also pointed out that studies have "shown that when the outcome

3   is known that that influences the interpretation.  So, for instance, if the obstetrician

4   knows that there was a bad outcome, they will be much more critical of the heart

5   rate tracing."  (*Id.* 726:18-21.)  These studies are important because a finding of

6   breach of the standard of care in medical negligence cases must be based on what

7   the obstetrician knew at the time, without hindsight bias.  *See Vandi v. Permanente*

8   *Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070 (1992) (stating, "in treating a patient a

9   physician can consider only what is known at the time he or she acts.").

### c. Dr. Hawkins

11        Dr. Hawkins is a board-certified obstetrician gynecologist.  She has been a

12   practicing obstetrician gynecologist for twenty-eight years.  In 2018, Dr. Hawkins'

13   work was split evenly between obstetrics and gynecology, and she contracted to do

14   five obstetric on-calls per month for patients who go into labor at various hospitals.

15   When working an on-call shift, Dr. Hawkins' duties entailed labor and delivery,

16   postpartum, emergency room, and post-op patients.  Dr. Hawkins estimates she has

17   delivered between 10,000 and 50,000 babies during her career.  The Court credits

18   Dr. Hawkins' testimony.  She testified at length and was visibly upset for FRV, Ms.

19   Valenzuela and the family about the outcome of FRV's delivery, while standing by

20   the decisions she made.

21        Based on Dr. Hawkins' testimony and the history she took of Ms. Valenzuela

22   at 9:41 a.m. on the day of admission, Dr. Hawkins knew that Ms. Valenzuela was

23   scheduled for an induction two days later, and that she had gestational diabetes, mild

24   pre-eclampsia, and advanced maternal age.  She knew that Ms. Valenzuela had given

25   birth vaginally three prior times without incident, and her baby in 1998 was large,

26   weighing 9 lbs, 2 oz. at delivery.  She knew the estimated weight of FRV was 8 lbs.,

27   5 oz. to 9 lbs. based on her clinical exam, or 4,017 grams (8 lbs., 13 oz.) based on

28   the ultrasound.  Dr. Hawkins also noted at that time a fetal heart tracing reflecting

"130 baseline, no decelerations, good variability, category I Occasional uterine contraction." (Jt. Ex. 016-001.)   The plan, therefore, was for "normal vaginal delivery." (Jt. Ex. 016-002.)

Dr. Hawkins testified that a patient's labor and delivery is a team process, and that she is the captain of the team.  Nurse Wildern was the primary nurse for Ms. Valenzuela from her admission until Nurse Montes took over at 7:00 p.m.  Typically, too, there is a charge nurse responsible for all nurses working at the time who also periodically reviews fetal heart tracings.  There was a charge nurse working on the day of Ms. Valenzuela's labor.  The nurses and Dr. Hawkins testified that when the nurses charted FRV's heart tracings as Category II, the nurse at the time would take interventions, e.g., by changing Ms. Valenzuela's position or administering oxygen to attempt to bring the tracings back to Category I.  Dr. Hawkins relied on the nurses to take appropriate action and advise her if their interventions were not effective.  Nurse Wildern's records are consistent with the foregoing practice.

Dr. Hawkins testified she was unable to recall when, or how often, she reviewed FRV's heart tracings, but she noted that her "customary practice [is] to review the strip if I'm notified by the nurse that there is an issue with the strip." (Trial Tr. 186:2-6.)  She stated that if the nurses charted late decelerations and minimal variability, that would not cause her to review the tracings more frequently because she trusts the nurses would take appropriate action and alert her if the interventions were not successful.  According to Nurse Wildern's records, she reviewed FRV's heart tracings with Dr. Hawkins at 9:45 a.m., 12:34 p.m., and 1:20 p.m.  Her records also indicate juice was given to Ms. Valenzuela for blood pressure at 10:33 a.m., and Nurse Wildern testified she would have only given juice after communicating with Dr. Hawkins.  Dr. Kingston opined that an obstetrician acting within the standard of care can rely on labor and delivery nurses to monitor fetal heart tracings, take interventions to alleviate fetal stress, and generally assist the patient as necessary.  Dr. Hawkins did so here, and the Court finds she acted within

1  the standard of care in doing so.

2          However, it was solely Dr. Hawkins' responsibility to determine whether

3  cesarean delivery was necessary.  It is undisputed that such a decision must be based

4  on all of the clinical circumstances, and that it is not without risk.  Obstetricians

5  "have to be very careful and very judicious when [they] are considering how to

6  deliver . . . it is a constant balancing act between risks and benefits of continuing

7  with labor versus risks and benefits of the cesarean."  (Trial Tr. 770:19-23.)  Dr.

8  Kingston stated that "[w]e are, as human beings, designed to birth babies vaginally,

9  and we should support that when we feel it is safe[,]" (*id.* 835:18-20), noting that

10  cesarean delivery involves "major abdominal surgery."  (*Id.* 769:11-19.)  Dr.

11  Hawkins testified "[i]t has been shown that a vaginal delivery is safer than a cesarean

12  delivery.  The morbidity and mortality is much less." (*Id.* 388:6-8.)  Dr. Hawkins

13  believed that a C-section was "absolutely not [medically] indicated [for Ms.

14  Valenzuela], and it would not have been appropriate to perform a cesarean section."

15  (*Id.* 444:1-4.)  Dr. Kingston agreed, and opined that if C-sections were ordered based

16  on similar tracings as FRV's, more than 50% of deliveries would be cesarean rather

17  than vaginal.

18          Ms. Valenzuela and Ms. Cazares testified that Ms. Valenzuela expressed

19  concern to Dr. Hawkins about the fetal weight of FRV.  Dr. Hawkins disputed that

20  such a conversation happened, because if it did, it would have been in her report,

21  and it is not. (*See id.* 404-408; *see also* Jt. Exs. 016, 018.)  The Court, however, need

22  not make credibility determinations here, because even assuming the conversation

23  occurred, "a physician should not prescribe a procedure which is not medically

24  indicated simply because the patient desires it."  *Vandi*, 7 Cal. App. 4th at 1070.  The

25  ACOG guidelines support Dr. Hawkins' decision as the guidelines recommend

26  elective or prophylactic cesarean section on a diabetic patient if the estimated fetal

27  weight is greater than 4,500 grams (9 lbs., 14 oz.).  FRV's estimated fetal weight

28  was 4,017 grams (8 lbs., 13 oz.), and Ms. Valenzuela had previously naturally

delivered a child that weighed 9 lbs., 2 oz.   Based on Ms. Valenzuela's clinical circumstances, Dr. Hawkins did not believe a C-section was medically indicated. Dr. Kingston also noted that Ms. Valenzuela's history of three natural births without incident was very significant and made her "a great candidate to do it again." (Trial Tr. 751:5-13.)   She testified that after reviewing Ms. Valenzuela's case, if the obstetrician had ordered an urgent C-section under the circumstances, she "would be a little surprised[.]" (*Id.* 768:25-769:6.)

Plaintiffs recognize that "medicine is practiced in the real world in dynamic, evolving situations," particularly with labor and deliver, and medical providers must "look at all of the clinical circumstances." (*Id.* 1525:10-15.)   Neither expert looked at the fetal heart tracings in a vacuum, and both experts testified that such tracings should be interpreted in the context of the entire clinical picture.   Accepting Plaintiffs' theory of the case invites the Court to interpret the tracings through the lens of hindsight.   But an obstetrician "can consider only what is known at the time he or she acts[,]" *Vandi*, 7 Cal. App. 4th at 1070, and the Court finds that the real-time interpretations of FRV's tracings by the nurses and Dr. Hawkins were reasonable.

Dr. Phillips' interpretations strayed from AGOG's definitions from time-to-time.   For example, between 8:49 a.m. and 8:57 a.m., he identified what "might be a late deceleration" in the absence of a visually apparent change in the baseline.   That opinion is inconsistent with AGOG 106 and the opinions of Drs. Hawkins and Kingston, and Nurse Wildern who charted the tracing as a Category I.   At 9:01 a.m., Dr. Phillips identified a "suggestion of a late deceleration."   But as Dr. Kingston noted, a "suggestion" is not accepted terminology, and the tracing at that time did not reveal a visually apparent drop in fetal heart rate.   She further opined that the tracings at 9:01 a.m. simply appear to be variability because, per ACOG, variability is a subtle change in the baseline.   Dr. Phillips also identified a prolonged deceleration between 9:29 a.m. and 9:33 a.m., which appears to be inconsistent with

the AGOG standard—i.e., that the fetal heart rate falls fifteen beats per minute below the baseline for at least two minutes.  As Dr. Kingston noted, there were no such markers between 9:29 a.m. and 9:33 a.m., and thus there was an absence of criteria indicating a prolonged deceleration.

Moreover, the existence of recurrent decelerations, i.e., decelerations occurring with at least 50% of the mother's contractions, can be an important indicator that the fetus is not tolerating labor.  The Court is unable to conclude that the tracings at issue reveal persistent Category II tracings with recurrent decelerations and minimal-to-absent variability.  Because the interpretation of FRV's tracings is disputed, and Plaintiffs have not established those tracings, along with the other clinical circumstances, indicated an urgent C-section at 11:30 a.m., Plaintiffs have failed to prove by a preponderance of evidence that Dr. Hawkins' management of Plaintiffs' labor and delivery fell below the standard of care.  In addition, Ms. Valenzuela previously delivered three children naturally without incident, including one LGA baby.  The sizing ultrasound and physical examination also suggested fetal weight within manageable limits.  The Court therefore finds Dr. Hawkins exercised that level of skill, knowledge, and care in her diagnosis and treatment of Ms. Valenzuela and FRV that other reasonably careful obstetricians would have used in the same or similar circumstances.  An undesirable outcome invites second-guessing, particularly in a case like the present one which involves a precious child and loving family.  Nevertheless, despite the difficult outcome, the Court finds Dr. Hawkins acted within the standard of care.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.

### CONCLUSION AND ORDER

For these reasons, the Court finds Defendant not liable.   Accordingly, the Clerk of Court shall enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

Dated:  August 17, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court